UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X

KRESO BEZMALINOVIC,

                    Petitioner,                    04 Civ. 7569 (MGC)

          - against -                                    <u>OPINION</u>

UNITED STATES OF AMERICA,

                    Respondent.

-------------------------------X


APPEARANCES:


          HERZFELD & RUBIN, P.C.
          Attorneys for Petitioner
          40 Wall Street
          New York, NY 10005

          By:  Ronald G. Russo, Esq.



          DAVID N. KELLEY
          United States Attorney for the
          Southern District of New York
          Attorney for Respondent
          One St. Andrew's Plaza
          New York, NY 10007

          By:  Peter B. Sobol
               Assistant United States Attorney

**CEDARBAUM, J.**

Kreso Bezmalinovic petitions to vacate his judgment of conviction pursuant to 28 U.S.C. § 2255 on the ground that he was denied effective assistance of counsel.  For the reasons that follow, Bezmalinovic's petition is denied.

BACKGROUND

In 1996, Kreso Bezmalinovic was charged in a seven-count superseding indictment with conspiracy to commit major fraud against the United States, mail fraud, and obstruction of justice (Count One); major fraud against the United States (Counts Two and Three); mail fraud against American International Group, Incorporated ("AIG") (Counts Four and Five); and obstruction of justice (Counts Six and Seven).

Bezmalinovic's trial commenced on June 11, 1997.  The evidence at trial demonstrated that between 1988 and 1992, Bezmalinovic and his coconspirators set up a company he secretly controlled, National Abatement Contracting Corporation ("National Abatement"), in order to illegally obtain government contracts for asbestos removal.  In 1988, Bezmalinovic was convicted of giving a gratuity to an Environmental Protection Agency ("EPA") official.  As a result, Bezmalinovic and the company of which he was vice-president, P.C. & J. Contracting Co., Inc. ("PC&J"), were suspended and then barred from procuring contracts with the

United States.  Bezmalinovic and his coconspirators then used National Abatement, which they caused to maintain an appearance of independence from PC&J and from Bezmalinovic, to evade the suspension and bar and procure contracts with the government.

The evidence at trial also demonstrated that in February and July 1991, National Abatement received grand jury subpoenas as part of a criminal investigation into the relationship between National Abatement and PC&J.  In response to these subpoenas, Bezmalinovic and his coconspirators agreed to prepare and then prepared fictitious documents to make National Abatement appear to be an independently operating company, and produced these documents to the government.  The government's proof at trial included testimony by former PC&J and National Abatement employees, Bezmalinovic's coconspirators, representatives of the government who contracted with or investigated Bezmalinovic and his companies, and corroborating documents.

On June 27, 1997, the jury convicted Bezmalinovic on Counts One, Two, Three, Six and Seven.  The Jury failed to reach a verdict on Counts Four and Five.  Following the verdict, by agreement of the parties, in lieu of a trial on certain outstanding severed tax charges, I held an evidentiary hearing pursuant to <u>United States v. Fatico</u>, 458 F. Supp. 388 (E.D.N.Y. 1978), <u>aff'd</u>, 603 F.2d 1053 (2d Cir. 1979), to resolve certain

disputed factual issues for purposes of sentencing. At the conclusion of the hearing, I made findings of fact based on the preponderance of the credible evidence. <u>United States v. Bezmalinovic</u>, No. 96 Cr. 97 (MGC), 2000 WL 84879 (S.D.N.Y. Jan. 21, 2000). I found that Bezmalinovic had retained control and ultimate authority over PC&J and National Abatement for all expenditures and recordings on the corporate books and tax returns. In addition, I found that Bezmalinovic had regularly paid employees unrecorded or falsely recorded compensation from which no payroll taxes had been withheld; that during negotiations with the Internal Revenue Service ("IRS") Bezmalinovic had signed an acknowledgement stating he was 100% responsible for funds withheld from PC&J employees' salaries but not turned over to the government; that he had represented to the IRS in April 1992 and March 1993 that Maguire was not in control of PC&J; that he had submitted documents to the IRS stating that Maguire had in fact controlled PC&J when it became delinquent in its payroll taxes; and that based on the later representation the IRS had abated the penalty it had assessed against Bezmalinovic. <u>Id.</u> at *1-2.

On May 8, 2000, Bezmalinovic was sentenced to a term of 41 months' imprisonment, followed by two years' supervised release, a fine in the amount of $6,000, and a mandatory special

assessment of $250. Bezmalinovic appealed to the Second Circuit, arguing that (1) the District Court erred in refusing his proposed jury charge, drawn from an analogy to tax law, on the difference between lawful acts of avoidance and unlawful acts of evasion; (2) the District Court applied the wrong version of the Sentencing Guidelines, in violation of the Ex Post Facto Clause of the United States Constitution; and (3) he was denied effective assistance of counsel because his trial attorney, Marc Bogatin, implied in summation that there was a close tie between PC&J and National Abatement contrary to Bezmalinovic's defense, failed to call certain witnesses, and prevented Bezmalinovic from testifying. The Second Circuit rejected Bezmalinovic's arguments,[1] but nonetheless vacated the sentence and remanded for the limited purpose of "conform[ing] the sentence and judgment with the allocation provision of U.S.S.G. § 2J1.7." United States v. Bezmalinovic, 14 Fed. Appx. 61, 64 (2d Cir. 2001) (mem.). On March 21, 2002, Bezmalinovic was resentenced to 41 months' imprisonment, with 30 months allocated to the underlying offense and 11 months to the enhancement pursuant to U.S.S.G. § 2J1.7, and the same supervised release period, monetary fine, and

---

[1] The Court of Appeals declined to review Bezmalinovic's claim that his attorney prevented him from testifying because it depended upon "grounds that are not fully developed in the record." United States v. Bezmalinovic, 14 Fed. Appx. 61, 64 (2d Cir. 2001)(quotation omitted).

special assessment as in his original sentence.  The revised sentence was affirmed on appeal.  <u>United States v. Bezmalinovic</u>, 76 Fed. Appx. 375 (2d Cir. 2003) (mem.).

On September 24, 2004, Bezmalinovic filed the present petition pursuant to 28 U.S.C. § 2255.  In his petition, Bezmalinovic asserts that he was denied effective assistance of counsel because his trial attorney (1) failed to pursue adequately the defense theory that Bezmalinovic had acted in good faith and in reliance on the advice he received from his coconspirator, John Maguire, whom he believed to be an attorney; (2) did not explain to Bezmalinovic that it was his decision alone whether or not to testify at trial; and (3) failed to investigate and present certain "critical" witnesses.

DISCUSSION

The Sixth Amendment to the United States Constitution vests persons charged with crimes with the right to "the Assistance of Counsel."  U.S. Const. amend. VI.  That right encompasses the right to <u>effective</u> assistance of counsel.  <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970).  To establish a violation of this right, a claimant must satisfy the two-prong test articulated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  A claimant must show both that "counsel's performance was deficient" <u>and</u> "that the deficient performance prejudiced the defense."  <u>Id.</u> at 687.

7

To establish the first prong, a claimant must demonstrate that "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." Id. at 690. To establish the second prong, a claimant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. As a general rule, trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. Only if both Strickland prongs are satisfied may a court conclude that "counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," and thus that "the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

I.   <u>Failure to pursue defense of good faith reliance</u>

Bezmalinovic first argues that his counsel abandoned mid-trial the defense theory that Bezmalinovic had acted in "good faith reliance on the advice he received from John Maguire, Esq., [which] was the central theory of a fully available defense to the charges, and was indeed the defense theory on which defense counsel's opening statement was premised."  Pet. ¶ 2.

Assuming, *arguendo*, that this conduct could constitute a <u>Strickland</u> violation, Bezmalinovic's contention is factually unsupported.   The trial record clearly reflects that Bezmalinovic's counsel emphasized, as fully as the facts permitted, evidence of Bezmalinovic's good faith reliance on Maguire, both during trial and in his summation to the jury.

For example, during the cross-examination of Maguire, Bezmalinovic's counsel established that Maguire had never told Bezmalinovic that under the compliance agreement with the EPA, which Maguire had negotiated, Bezmalinovic was required to sever

all involvement with PC&J. Trial Tr. at 684-85.[2] Bogatin also elicited Maguire's admission that he had told Bezmalinovic, while his government suspension was pending, that it was permissible for him to set up and fund National Abatement in order to compete for government contracts.[3] Id. at 690-91.[4] Bogatin also sought

---

[2]   Bogatin cross-examined Maguire as follows:

Q.   Did you ever tell him or advise him that under the compliance agreement he would have to cease working at PC&J? Did you ever tell him, you have to stop working here under the agreement, yes or no?

A.   The answer is no.

Q.   Did you ever tell him, you have to quit the company, sever all relationship [sic] under the agreement; did you tell him that?

A.   I would not tell him that.

[3]   To bolster this point, Bezmalinovic's counsel also elicited the admission of Gabriel Mirkov, president of National Abatement, that based on his conversations with Maguire, he believed that allowing National Abatement to perform government contracting using PC&J credit and resources would be permissible. See Trial Tr. at 950-51.

[4]   Bogatin cross-examined Maguire as follows:

Q.   Now, at the time that the suspension came in, and during the period leading up to the suspension when you believed that the suspension was likely or probable, during that period it was discussed that another company could be formed which would do government bidding, correct? And you told us about that yesterday and the day before?

A.   Yes.

Q.   Since this company that became National Abatement was not on any debarred list, that would be allowed to perform government work?

A.   Since National Abatement was not debarred, they could perform works, yes.

Q.   That's what you discussed with Mr. Bezmalinovic?

A.   The initial discussions were not concerning National Abatement. It was concerning creating a new company. And since it was a new company, it would not be debarred or suspended.

Q.   And that is what you discussed with Mr. Bezmalinovic?

to demonstrate that Bezmalinovic had no reason to doubt Maguire's honesty by establishing that Maguire, when first retained by Bezmalinovic to work for PC&J, had failed to properly notify Bezmalinovic of his then-imminent suspension from the bar for misconduct. <u>Id.</u> at 531-32.[5] Finally, in cross-examining the EPA official who had handled Bezmalinovic's suspension and debarment,

---

A.    Yes.

Q.    You told him that PC&J could provide some of the initial start up capital funding to get this company underway, correct?

A.    The initial discussions were [with] the Bezmalinovics, personally.

Q.    So, the discussions were they, personally would provide funding to get the company underway?

A.    Correct.

[5]    Bogatin cross-examined Maguire as follows:

> Q.    You know that Mr. Bezmalinovic was a client at that time; is that correct?
>
> A.    That's correct.
>
> Q.    And you were required by court rules and by court order when you were suspended, you were required to notify him as a client in writing of your suspension; is that correct?
>
> A.    That's true.
>
> Q.    You did not comply with that court order and court rule; is that correct?

A.    Correct

Q.    In addition, you are required to file an affidavit with the court that suspended you stating that you have notified all of your clients of your disbarred status; is that true?

A.    That's true.

Q.    You did not do that, either, did you?

A.    I did not file any affidavits.

Q.    So, there is nothing in writing that would indicate that you, in fact, told Mr. Bezmalinovic of your situation when you asked him if you could go join his firm; is that correct?

A.    Nothing that I know of.

Bezmalinovic's counsel successfully sought confirmation that Maguire was the more sophisticated and knowledgeable of the two about what was legally permissible. Id. at 121.

In addition to pursuing the theory that Bezmalinovic relied in good faith on Maguire during trial, Bezmalinovic's counsel carefully emphasized that theory in his summation to the jury:

> I think Maguire admitted or testified that it was his idea, he's the one who advised Kris [Bezmalinovic]: You know, we don't have to go out of business, we don't have to shut down. He said to Kris: We can start a new company. And he told Kris: We can use your resources, your facilities, your credit, your money, we will start a new company. And Maguire told Kris: We can subcontract out the work to PC&J, this is legal, this is proper, this is something that's permissible.
>
> . . . .
>
> ...[T]his is a criminal case, not a civil case, the government is not suing to set aside a contract .... They brought a charge of a crime, a serious crime against Mr. Bezmalinovic. The crime charged involves criminal intent.
>
> ...[I]f Mr. Bezmalinovic believed in good faith that this was a permissible response to a government regulation, a government order, if he believed in good faith that you can do this ... there is simply no crime and you must acquit. Also as her Honor will instruct you, the burden of establishing lack of good faith is on the government. The defendant does not have to prove or establish anything.
>
> . . . .
>
> Mr. Maguire said to Kris, National will use you, your facility, resources, your credit, you'll stand behind National ... And there is no dispute about that. Maguire tells Kris, it is OK, you can do it.

Who was Maguire? Her Honor will give you an instruction with regard to the concept of reliance on counsel. Her Honor will explain to you what is required and what that defense means. But I believe, in substance, it means if you follow or rely on the advice of somebody you believe to be an attorney in good faith, if you follow that person's advice, there is simply no criminal intent.

Now, I know the government will argue and they have argued that Maguire was not a lawyer, he told Kris he's not a lawyer. So where is the good faith, this is all a big fraud because the guy's not even a lawyer and Kris knows about it.

Well, what's the evidence on the issue of Maguire being a lawyer and telling, advising Kris that he's not a lawyer? We know Maguire is required by state law to give his client a notification in writing [saying] I've been disbarred. He never did that. It violates the law. And we know, Maguire is telling you, what he's telling you is that he goes to Kris and says, look, you know, I've done this, I've done that, take me in, give me a second chance. Basically tells the guy, you know, I've stolen from clients, you are a client, I've stolen from clients, I didn't steal from you, I guess, but I've stolen from client[s], I've lied to clients, give me a job, take me in, let me run your company, give me an office and Kris says why not. I submit that's unworthy of belief.

Id. at 1509-13.

These passages make clear that Bezmalinovic's counsel emphasized the evidence of Bezmalinovic's good faith defense throughout the trial and in his summation to the jury, as fully as the facts permitted. In addition, the defense of good faith was charged to the jury. Although Bezmalinovic appealed the Court's charge, the Second Circuit concluded that the substance of his proposed charge "was given by the court in its own language." Bezmalinovic, 14 Fed. Appx. at 63 (quotation omitted). Bezmalinovic's good faith defense was thus thoroughly pursued and presented to the jury. Accordingly, Bezmalinovic's argument that his lawyer's representation denied him the

opportunity to present a "fully available defense to the charges" is groundless.

II. <u>Failure to inform of the right to testify</u>

Bezmalinovic also argues that his trial counsel failed to advise him that the decision whether or not to testify at trial was his alone to make. Pet. ¶¶ 2, 27.

A defendant in a criminal case has the right to testify in his own behalf. <u>Rock v. Arkansas</u>, 483 U.S. 44, 49 (1987). That right can only be waived by the defendant himself. <u>Brown v. Artuz</u>, 124 F.3d 73, 77 (2d Cir. 1997). The burden of ensuring that the defendant is informed of his right to testify "is a component of the effective assistance of counsel." <u>Id.</u> at 79. Therefore, "regardless of strategic considerations that his lawyer concludes weigh against such a decision, a defendant who wishes to testify must be permitted to do so." <u>Id.</u> at 77.

In support of his claim, Bezmalinovic submitted his affirmation stating that "[a]t no time did Mr. Bogatin tell me that I had the right to testify, and that the decision whether or not to do so was mine alone to make." Pet. ¶ 2, Exh. A ¶ 7. In response, the government submitted an affirmation from Bezmalinovic's counsel stating that he and Bezmalinovic had "numerous discussions about trial strategy, including the pros and cons of his testifying," and that he "at all times informed [Bezmalinovic] that it was his decision whether to testify or

not, and not mine, but my firm advice was that it was in his best interests not to testify." Bogatin Aff. ¶ 8.

On January 11, 2005, I held an evidentiary hearing to determine whether Bogatin failed to inform Bezmalinovic that it was his right to testify in his own behalf. At the hearing, Bezmalinovic testified that he had always understood that he would take the stand. However, on the last day of trial his counsel informed him that he would not let him testify, and that he would have to find a new attorney if he insisted on taking the stand. Hr'g Tr. at 37. According to Bezmalinovic, he was never told that the decision whether or not to testify was his own. Id. at 41. Bezmalinovic's son, Peter Bezmalinovic, testified that he had witnessed part of Bezmalinovic's discussion with Bogatin, and had been told by his father that Bogatin would not let him testify. Id. at 6. Bezmalinovic's daughter, Doris Skoda, testified that it had been her understanding throughout the trial that her father would take the stand, and that her father told her on the last day of trial that Bogatin would not permit him to testify. Id. at 20-22.

Bogatin testified that, as is his practice, he had informed Bezmalinovic that it was Bezmalinovic's decision whether or not to testify in his own behalf. Id. at 62, 89-90. He denied ever

having told Bezmalinovic that he would resign had Bezmalinovic insisted on taking the stand. <u>Id.</u> at 67. He further testified that on a number of occasions, both before and during the trial, he had discussed with Bezmalinovic whether Bezmalinovic should testify or not. Bogatin's firm advice to Bezmalinovic was to not take the stand, and Bezmalinovic agreed to follow that advice. <u>Id.</u> at 62-63, 65-66, 77.

In his testimony, Bogatin detailed the reasons behind his advice. He noted the risk that Bezmalinovic would have been cross-examined on adverse matters that the jury was unaware of-- Bezmalinovic's prior conviction and other prior bad acts, as well as the evidence of tax fraud and bank fraud raised in the subsequent <u>Fatico</u> hearing. <u>Id.</u> at 63-65, 76. In addition, Bogatin explained to Bezmalinovic that by taking the stand Bezmalinovic was running the risk of a potential sentence enhancement for perjury.[6] <u>Id.</u> at 63, 76-77. Finally, Bogatin testified that there was direct evidence indicating that certain transactions between PC&J and National Abatement were not arm's length transactions. While it was one thing for the government's witnesses to say so, it was another thing for Bezmalinovic to be unable to explain such evidence on the stand. <u>Id.</u> at 64. Bogatin testified that he had explained to Bezmalinovic that if

_____

[6] After the Court administered a similar warning in the <u>Fatico</u> hearing, Bezmalinovic decided not to testify. <u>See</u> Fatico Hr'g Tr. at 490.

he were to take the stand, the jury might divert its attention from whether the government had met its burden of proof to whether Bezmalinovic was telling the truth.  Id. at 62-63.

After observing the witnesses, evaluating their credibility, and weighing all of the evidence, I find Bogatin's detailed testimony credible.  I do not credit Bezmalinovic's testimony that Bogatin failed to inform him that it was his decision whether or not to testify or that Bogatin would not permit him to testify.  Accordingly, the petition is denied.

III. <u>Failure to investigate and call witnesses</u>

Finally, Bezmalinovic contends that his attorney was ineffective by failing "to pursue leads and interview and present witnesses that Mr. Bezmalinovic had presented to him and requested that he pursue." Pet. Mem. at 12. Specifically, Bezmalinovic asserts that his trial counsel failed to call Bezmalinovic himself, as well as Marie Chang, Tom Clark, Jim Prescott, Linda Wimberly, Piotr Watala, Thomas Vera, and Frank Murray as trial witnesses. Bezmalinovic also argues that his counsel failed to establish through the cross-examination of Marjorie Franzman, a Department of Labor Special Agent who testified at trial, that Bezmalinovic had helped the government seize certain documents from Maguire's car in response to one of the subpoenas served on National Abatement.

In his direct appeal following his conviction, Bezmalinovic made identical claims as to Chang, Prescott, Vera, and Franzman. After reviewing the record, the Court of Appeals found those claims to be without merit. <u>See</u> <u>Bezmalinovic</u>, 14 Fed. Appx. at 64. It is settled that "a § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'" <u>United States v. Sanin</u>, 252 F.3d 79, 83 (2d Cir. 2001) (quoting <u>Cabrera v. United States</u>, 972 F.3d 23, 25 (2d Cir. 1992)). Bezmalinovic is accordingly "procedurally barred from

proceeding" with these claims.   <u>Sanin</u>, 252 F.3d at 83.   In
addition, two of the remaining witnesses, Murray and Watala, did
in fact testify at trial.   Bezmalinovic's claim that his attorney
failed to call these witnesses is therefore meritless.   Even if
Bezmalinovic's contention is that these witnesses were not
thoroughly examined or cross-examined, Bezmalinovic has not
identified any "critical" testimony that his lawyer failed to
elicit from these witnesses.   <u>See</u> <u>United States v. Eisen</u>, 974
F.2d 246, 265 (2d. Cir. 1992) (noting that "[d]ecisions whether
to engage in cross-examination, and if so to what extent and in
what manner, are ... strategic in nature" and therefore generally
immune to challenge).

This leaves three witnesses--Bezmalinovic, Clark, and
Wimberly--whom Bogatin did not call to testify.   It is well-
established that "[t]he Constitution does not oblige counsel to
present each and every witness that is suggested to him." <u>Pavel</u>
<u>v. Hollins</u>, 261 F.3d 210, 220 (2d Cir. 2001) (quotation omitted).
As a general matter, counsel is presumed to have acted reasonably
because "[t]he decision whether to call any witnesses on behalf
of the defendant, and if so which witnesses to call, is a
tactical decision of the sort engaged in by defense attorneys in
almost every trial." <u>Eisen</u>, 974 F.2d at 265 (quotation omitted).

As for Wimberly and Clark, Bezmalinovic contends that their testimony as the accountant and lawyer for PC&J and National Abatement would have established that he was not in control of the companies. Bogatin explained, however, that he had decided not to call Wimberly after her attorney advised him that, if called, she would testify that Bezmalinovic in fact controlled PC&J and National Abatement, and that they were intermingled as one entity with no attention paid to corporate formalities. Bogatin Aff. ¶ 7(d). Bezmalinovic's counsel decided not to call Clark after Clark had advised him that he would provide adverse testimony and contradict in a material respect the testimony of another defense witness, Eva Walter. <u>Id.</u> ¶ 7(b). Thus, it was a reasonable tactical decision for Bezmalinovic's counsel, after having contacted Wimberly and Clark and considered the utility of their testimony, not to call these witnesses. <u>See</u> <u>United States v. Schmidt</u>, 105 F.3d 82, 90 (2d Cir. 1997) ("The tactical decision of whether to call specific witnesses [after considering their potential testimony]--even ones that might offer exculpatory evidence--is ordinarily not viewed as a lapse in professional representation.").

As for Bogatin's failure to call Bezmalinovic, as discussed above, Bogatin credibly testified that he had had a number of

cogent reasons for not calling Bezmalinovic to the stand, not the least of which was the potential exposure to sentence enhancement and to cross-examination on Bezmalinovic's prior conviction and prior bad acts.  The failure to put Bezmalinovic on the stand, therefore, can hardly be considered a lapse in representation. See Eisen, 974 F.2d at 265 (rejecting claim that lawyer should have advised defendant to testify in his own behalf because "[i]t was a reasonable tactical decision to rely exclusively on attacking the Government's witnesses and presenting independent testimony rather than to subject [the defendant] to all of the risk attendant on cross-examination.").

In any event, even if in hindsight it would have been helpful had Wimberly, Clark, or Bezmalinovic testified at trial, Bezmalinovic has not demonstrated that this additional evidence would have made it "reasonably likely" that the jury would not have convicted him, as required by the second prong of the Strickland test.  The additional evidence would have been weighed against the government's strong proof--testimonial and documentary--that showed that Bezmalinovic was in fact guilty of the crimes he had been charged with.  See Schmidt, 105 F.3d at 90 (no prejudice for failure to call helpful witnesses in light of government's strong proof).  Thus, even had the failure to call

these witnesses fallen "outside the wide range of professionally competent assistance," <u>Strickland</u>, 466 U.S. at 690, Bezmalinovic has not shown that he was prejudiced by it.

CONCLUSION

For the foregoing reasons, Bezmalinovic's petition to vacate his judgment of conviction is denied.

SO ORDERED.

Dated:     New York, New York
           July 29, 2005

                        S/ _____
                              MIRIAM GOLDMAN CEDARBAUM
                              United States District Judge